United States District Court
for the
Southern District of Florida

| | |
|---|---|
| ECB USA, Inc. and others, Plaintiffs, <br><br> v. <br><br> Chubb Insurance Company of New Jersey and Executive Risk Indemnity, Inc., Defendants. | ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 20-20569-Civ-Scola |

### Amended[1] Omnibus Order

The Defendants—insurance providers—move for summary judgment on all claims asserted by the Plaintiffs—assignees of certain insurance-related claims. (ECF No. 161.) The Plaintiffs also move for partial summary judgment on two specified issues. (ECF No. 154.) The parties filed oppositions in response to each motion (ECF Nos. 186, 187), and each filed a reply in support of their respective motions (ECF Nos. 193, 195). Resolution of these cross motions for summary judgment also entails review and consideration of the Defendants' motion to dismiss Count One (ECF No. 143) and the Plaintiffs' motion to substitute (ECF No. 215), both of which were fully briefed. After careful consideration of the briefing, the record, and the relevant legal authorities, the Court **grants in part and denies in part** the Defendants' motion for summary judgment (**ECF No. 161**) and **grants in part and denies in part** the Plaintiffs' motion for partial summary judgment (**ECF No. 154**). Moreover, the Court **denies** the Defendants' motion to dismiss (**ECF No. 143**) and **grants** the Plaintiffs' motion to substitute (**ECF No. 215**).

1. **Background**

As a general matter, insurance policies and insurance salesmen have long been the butt of jokes. The former are not known for beautiful prose nor the latter for exciting conversation. But insurance contracts can provide fodder for scores of attorneys, grammarians, and logophiles, where, as here, the meaning of one phrase and the placement (or omission) of one comma can make the difference between coverage and nothing.

---

[1] This order has been amended to clarify the scope of the Court's disposition of the Plaintiffs' reformation claim (Count 3). The Defendants requested such clarification by a motion to amend (ECF No. 227), which was granted for the reasons set forth in an order that will be entered concurrently to this amended omnibus order.

On December 17, 2019, ECB USA, Inc, Atlantic Ventures Corp., and G.I.E. C2B (the "Plaintiffs") sued Chubb Insurance Company of New Jersey ("Chubb") in the Circuit Court of the Eleventh Judicial Circuit for various relief associated with Chubb's denial of insurance coverage in an earlier litigation. (ECF No. 1.) On February 7, 2020, Chubb removed the case to federal court on the basis of diversity jurisdiction. (*Id.*) On February 26, 2021, the Plaintiffs and Constantin Associates, LLP ("Constantin") filed the operative pleading, the Fourth Amended Complaint, which brings seven claims against Chubb and Executive Risk Indemnity, Inc. ("ERI"). (ECF No. 79.)

Before addressing the merits of each claim, the Court will briefly provide the relevant factual background. In an insurance dispute such as this, the Court will focus this discussion on: (1) the relevant actors, (2) the terms and negotiations of the relevant insurance policies, (3) the entities that are provided coverage under the relevant insurance policies, (4) the extent of coverage provided under the policies, and (5) the underlying lawsuit that is the subject of the alleged failure to defend and indemnify.

### A. The Actors

Control Associates/Constantin Group L.P. ("Control Group") is a limited partnership registered in Delaware that provides professional and consulting services. (ECF No. 156 at ¶ 5; ECF No. 184 at ¶ 5; ECF No. 155-51.) Constantin, a New York limited liability partnership, provides accounting and auditing services. (ECF No. 155 at ¶ 106; ECF No. 156 at ¶ 6; ECF No. 184 at ¶ 6.)

ERI, a Delaware-based corporation, issues professional liability insurance policies in New Jersey. (ECF No. 156 at ¶ 1; ECF No. 184 at ¶ 1.) Chubb is a New Jersey-based entity that also provides professional liability insurance policies in New Jersey. (ECF No. 156 at ¶ 2; ECF No. 184 at ¶ 2.) Both Chubb and ERI are subsidiaries of Chubb Limited. (ECF No. 156 at ¶ 3; ECF No. 184 at ¶ 3.) Sometimes, Chubb and ERI share underwriters, claims staff, and policies and procedures for underwriting and claims processing. (ECF No. 156 at ¶ 4; ECF No. 184 at ¶ 4.) From 2002 to 2019, either Chubb or ERI issued professional liability insurance policies to Control Group. (ECF No. 156 at ¶ 7; ECF No. 184 at ¶ 7.)

### B. The Policies

This dispute primarily centers around the terms and negotiations of one policy—the 2017-18 Policy. In 2017, Control Group obtained this professional liability insurance policy, number 8168-4190, from Chubb. (ECF No. 156 at

¶ 9; ECF No. 184 at ¶ 9; ECF No. 156-7.) The policy covered the period from December 12, 2017 to December 12, 2018. (ECF No. 156-7 at 5.)

The parties dispute whether the 2017-18 Policy was a renewal of the prior policy. Control Group had filed previous renewal applications, and the parties agree that the 2016-17 Policy was a renewal of the 2015-16 Policy. (ECF No. 156 at ¶¶ 23–24, 26; ECF No. 184 at ¶¶ 23–24, 26.) The 2017-18 Policy process began around September 2017 when Chubb sent Control Group, through a third party, a "non-renewal letter," indicating that Chubb did not yet have adequate information to underwrite Control Group's "upcoming renewal." (ECF No. 155-40; ECF No. 185 at ¶¶ 166–167; ECF No. 196 at ¶¶ 166–167.) In October 2017, Control Group, through a third party, requested a renewal application. (ECF No. 156-24; ECF No. 185 at ¶ 157; ECF No. 196 at ¶ 157.) One month later, Sean Murray, an underwriter for the Defendants, sent "the renewal app." (ECF No. 185 at ¶ 158; ECF No. 196 at ¶ 158; ECF No. 185-21.) And on December 6, 2017, Control Group submitted a "Professional Error and Omission Insurance Renewal Application." (ECF No. 196 at ¶ 159; ECF No. 196-5.) Indeed, the application form was labeled "Chubb Pro E&O Renewal Application," and, above the signature line, the application is referred to as the "Renewal Application." (ECF No. 196-5.) A week later, Chubb sent a binder letter for the 2017-18 Policy, stating "thank you again for the renewal business for [Control Group]." (ECF No. 185-24.)

### C. The Insureds

Control Group's policies from 2003 to 2017 were all under the applicant name "[Control Group] and Subsidiaries." (ECF No. 155 at ¶ 76; ECF No. 185 at ¶ 76.) But the entities provided coverage under the policies (the Insureds) were not necessarily limited to Control Group's subsidiaries. For example, the 2016-17 Policy covered any Insured, which was defined, in relevant part, as "the person or entity stated in Item 1 of the Declarations." (ECF No. 155-16 at 9.) Item 1 of the Declarations was amended by an endorsement—Endorsement No. 5—within the 2016-17 Policy, which provided a list of additional "Named Insured[s]," including Constantin. (ECF No. 93-3; ECF No. 155 at ¶ 79; ECF No. 155-16 at 6, 22; ECF No. 185 at ¶ 79.) Control Group first added Constantin to the "Named Insured list" in the 2015-16 Policy. (ECF No. 155 at ¶ 78; ECF No. 155-15 at 6; ECF No. 155-39; ECF No. 185 at ¶ 78.)

The 2017-18 Policy did not include Endorsement No. 5. (ECF No. 155 at ¶¶ 92, 94; ECF No. 185 at ¶¶ 92, 94.) Nevertheless, Control Group states that it intended that Constantin remain an Insured. (ECF No. 156 at ¶ 35.) Indeed, on December 12, 2017, before the completed binder letter was sent, Control Group was asked to confirm the "list of named insured" for the 2017-18

Policy—the list as proposed included Constantin. (ECF No. 155-43; ECF No. 156-31.)

But the definition of an "Insured" was different in the 2017-18 Policy. To determine who was an Insured, one must wade through multiple definitions:

- "Insured" was defined as "any Organization and any Insured Person."[2] (ECF No. 156-7 at 8; ECF No. 155-43 at 22.)
- "Organization" was defined as the "Parent Organization and any Subsidiary." (ECF No. 155-43 at 13.)
- The Parent Organization was defined as Control Group. (ECF No. 185-1.)
- Subsidiary was defined, in relevant part, as an entity for which Control Group, directly or indirectly, owns or controls the majority of the "outstanding securities representing the present right to vote for election of or to appoint" management. (*Id.*)

While the definition of Insured changed from the 2016-17 Policy to the 2017-18 Policy, the parties dispute whether Control Group received adequate notice of this change. (ECF No. 156 at ¶ 36; ECF No. 184 at ¶ 36.) The Defendants did not explicitly communicate to Control Group that there was a different definition of Insured and Subsidiary. The Defendants point to an e-mail dated December 4, 2017, in which Mr. Murray explained that the parties could "either keep [the 2017-18 Policy] on the current form or move it to the new form." (ECF No. 155-42.) Mr. Murray then explained that the "new form" had "a lot of enhancements to it"; Mr. Murray did not identify a change in the list of Insureds or a change in the definition of Insured. (*Id.*; ECF No. 185 at ¶ 85.) On January 9, 2018, Control Group was asked to review the 2017-18 Policy, and the Policy was on the "new form" that Mr. Murray had addressed earlier. (ECF No. 155-46.)

### D. The Coverage

In relevant part, the 2017-18 Policy provided coverage for claims related to "Management consulting services," which are defined as "services directed toward expertise in banking finance, accounting, risk and systems analysis, design and implementation, asset recovery and strategy planning for financial institutions." (ECF No. 155-37 at 23; ECF No. 185 at ¶ 1.) That definition remained the same from 2002 to 2017. (ECF No. 155 at ¶ 15; ECF No. 185 at ¶ 15.)

---

[2] "Insured Person," the definition of which is not relevant here, was defined as "any Executive or Employee of an Organization acting in his or her capacity as such." (ECF No. 155-43 at 22.)

Beginning in 2001, when applying for coverage, Control Group identified that all of its revenues were derived from either "management consulting" or "consulting." (ECF No. 155 at ¶¶ 16–20; ECF No. 185 at ¶¶ 16–20.) It was not until 2016 and 2017 that Control Group also identified "accounting" as included in its services. (ECF No. 155 at ¶¶ 22–23; ECF No. 185 at ¶¶ 22–23.)

### E. The Litigation

In 2018, the Plaintiffs sued Constantin in the Eleventh Judicial Circuit in Miami-Dade County for its alleged wrongdoing in connection with the provision of a professional audit (the "Underlying Litigation"). (ECF No. 156 at ¶ 40; ECF No. 184 at ¶ 40.) Constantin gave notice of the lawsuit to Chubb. (ECF No. 156 at ¶¶ 41–42; ECF No. 184 at ¶¶ 41–42.) But Chubb later issued two claim denial letters, denying coverage to Constantin for the sole reason that auditing services were not covered under the 2017-18 Policy. (ECF No. 156 at ¶¶ 43, 46; ECF No. 184 at ¶¶ 43, 46.) Chubb did not indicate in the claim denial letters that Constantin was not an Insured. (ECF No. 156 at ¶ 47; ECF No. 184 at ¶ 47.)

In November 2019, Constantin settled with the Plaintiffs, agreeing to judgment in favor of the Plaintiffs for $4,850,000 and agreeing to assign all rights against Chubb and ERI to the Plaintiffs. (ECF No. 156 at ¶ 48; ECF No. 184 at ¶ 48; ECF No. 156-38.) This current action was initiated approximately one month later. (ECF No. 1.)

## 2. Legal Standard

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions,

answers to interrogatories, and admissions on file and designate specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *See Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *See id.*

### 3. Analysis

The Defendants move for summary judgment on all counts (ECF No. 161), while the Plaintiffs only seek summary judgment on two issues, namely, that auditing services are covered under the 2017-18 Policy and that Constantin is an Insured under the 2017-18 Policy (ECF No. 154). The Court will address each.

As a preliminary matter, the Plaintiffs argue that New Jersey law applies to all claims. (ECF No. 154 at 3.) The Defendants did not contest this, but rather argue that there is a "false conflict" between New Jersey law and Florida law and that the laws of those states are, in relevant part, the same. (ECF No. 161 at 6 n.3.)

As the parties largely do not dispute the applicable law, the Court will apply New Jersey law. As to the contractual claims, Florida applies the doctrine of *lex loci contractus*, which holds that the law of the jurisdiction where the contract was executed governs. *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006). This occurred in New Jersey, so New Jersey law applies. (ECF No. 156 at ¶¶ 2, 51; ECF No. 184 at ¶¶ 2, 51.) As to the tort claims, Florida applies the "most significant relationship" test. *See Trumpet Vine Invs., N.V. v. Union Cap. Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996). For the reasons laid out by the Plaintiffs, the Court finds that New Jersey has the most significant relationship to the facts of this case. (ECF No. 154 at 3.)

### A. Count 1: Breach of Contract

The Plaintiffs allege that Chubb breached the 2017-18 Policy by failing to defend and indemnify Constantin in the Underlying Litigation. An insurer has a duty to defend where a plaintiff "alleges facts that fairly and potentially bring the suit within policy coverage." *Rosario v. Haywood v. Haywood*, 799 A.2d 32, 40 (N.J. App. Div. 2002); *Evanston Ins. Co. v. Heeder*, 490 F. App'x 215, 216 (11th Cir. 2012) (citing *Jones v. Fla. Ins. Guar. Ass'n*, 908 So.2d 435, 442–43

(Fla. 2005)). Moreover, an insurer has a duty to indemnify where the party seeking indemnification is actually covered under the policy. *See Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 483 A.2d 402, 405 (N.J. 1984); *Regions Bank v. Commonwealth Land Title Ins. Co.*, 977 F. Supp. 2d 1237, 1261–62 (S.D. Fla. 2013) (Scola, J.). It is the insured's burden to establish the duty to defend and the duty to indemnify. *See State Nat. Ins. Co. v. Cnty. of Camden*, No. 08-5128(NLH)(AMD), 2012 WL 6652819, at *2 (D.N.J. Dec. 19, 2012). Insurance contracts must be interpreted liberally in favor of coverage "to the full extent that any fair interpretation will allow." *State Nat. Ins. Co.*, 2012 WL 6652819, at *2; *see also Colony Ins. Co. v. Ramon*, No. 08-21812-CIV, 2009 WL 10699122, at *3 (S.D. Fla. July 30, 2009) (Seitz, J.).

The 2017-18 Policy provided coverage for claims related to "Management consulting services," which are defined as "[1] services directed toward expertise [2] in banking finance, accounting, risk and systems analysis, design and implementation, asset recovery and strategy planning [3] for financial institutions." (ECF No. 155-37 at 23; ECF No. 185 at ¶ 1.)

***First***, the parties argue whether the auditing of financial statements (the provision of which was the basis for the Underlying Lawsuit) constitutes "services directed toward expertise in . . . accounting[.]" The interpretation of an insurance contract is a question of law, and the Court must give the contract its plain and ordinary meaning. *See Princeton Inv. Partners, Ltd. v. RLI Ins. Co.*, CV171120KMMAH, 2018 WL 846917, at *5 (D.N.J. Feb. 9, 2018); *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 154 (D.N.J. 2013). An insurance contract is ambiguous if "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage," and courts may look to extrinsic evidence to determine whether an ambiguity exists and to resolve the ambiguity. *See Princeton Inv. Partners*, 2018 WL 846917, at *5 (quoting *State Nat. Ins.*, 10 F. Supp. 3d at 574–75); *CPS MedManagement*, 940 F. Supp. 3d at 154. However, courts must resolve any ambiguity in favor of coverage if a fair reading permits. *See Princeton Inv. Partners*, 2018 WL 846917, at *5 ("[I]f the controlling language of the policy will support two meanings, one favorable to the insurer and one favorable to the insured, the interpretation supporting coverage will be applied.").

The parties have spilt much ink on the proper interpretation of the clause "services directed toward expertise in . . . accounting," filing multiple motions for judicial notice and devoting much of their respective briefs to these arguments. Notwithstanding these other sources, the Court will start with the definition provided in the Policy.

Doing so, the Court finds that the auditing of financial statements falls within the contractual term "services directed toward expertise in . . . accounting." This provision is hardly ambiguous—auditing of financial statements is a widely recognized accounting service. *See* N.J.S.A 2A:53A-25 ("'Professional accounting services' includes, but is not limited to, the . . . audit of . . . a financial statement[.]"); Fla. Stat. § 473.302(8)(a) (defining services that fall within "public accounting"). And conducting an audit requires expertise, as the materials to which the Defendants point explain. (*See* ECF No. 175 at 6 ("[F]orensic accounting services . . . involve the application of . . . special skills in accounting, auditing, finance, quantitative methods . . . and research[.]") (quoting Code of Professional Conduct, 1.295.140, Forensic Accounting).)

The Defendants disagree, arguing that the term "services directed toward expertise in . . . accounting" must be interpreted in light of the usage of the term that it is defining—"management consulting services." (ECF No. 161 at 5–6.) The Defendants point to, among other things, various business dictionaries, certain standards promulgated by the American Institute of Certified Public Accountants, professional standards for public accountants, SEC guidance, as well as writings by the late Justice Scalia. (*Id.* at 6; ECF No. 195 at 4.) The Defendants argue that these extrinsic sources establish that "management consulting" does not include auditing, as consulting generally involves the analysis of management problems and the provision of recommendations, while auditing generally involves the attestation to financial statements. (ECF No. 161 at 6–8.)

However, the principles to which the Defendants point only apply where the contract is ambiguous. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, at 228 (2012) (noting that the principle that a definition is interpreted in light of the definiendum's context applies only where "a definition itself contains a term that is not clear"); *see also Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a [text] includes an explicit definition, [a court] must follow that definition, even if it varies from that term's ordinary meaning."). As held above, the definition of "management consulting services" is not "so confusing[ly]" ambiguous to warrant extensive resort to extrinsic evidence. *See Princeton Inv. Partners*, 2018 WL 846917, at *5. If the parties wished to limit coverage to "consulting" services in a way that comported with certain trade usage, the parties could have done so. But the parties contracted to an expansive definition of "management consulting services," which must be interpreted in favor of coverage if a fair reading

permits. *See State Nat. Ins. Co.*, 2012 WL 6652819, at *2. The Court must apply this plain meaning.[3]

**Second**, however, the Underlying Lawsuit did not concern the provision of accounting services to a "financial institution." This is undisputed. (ECF No. 155 at ¶ 72; ECF No. 185 at ¶ 72.) The Plaintiffs' only argument in opposition comes down to a comma. (ECF No. 186 at 6.) Recall the clause at issue: "[1] services directed toward expertise [2] in banking finance, accounting, risk and systems analysis, design and implementation, asset recovery and strategy planning [3] for financial institutions." (ECF No. 155-37 at 23; ECF No. 185 at ¶ 1.) The Defendants argue that covered accounting services must be provided to a financial institution, pointing to the series-qualifier canon, which holds that a modifier (here, "for financial institutions") at the end of a series of nouns or verbs "normally applies to the entire series." (ECF No. 161 at 13); *see Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021). The Plaintiffs argue that the series-qualifier canon only applies where there is a comma before the modifier—therefore, as there is no comma before "for financial institutions," the Plaintiffs argue that clause only qualifies the phrase immediately preceding it (namely, "asset recovery and strategy planning"). (ECF No. 186 at 6); *see Facebook*, 141 S. Ct. at 1170.

The Court finds that the phrase "for financial institutions" modifies the entire series, meaning that "management consulting services" is defined as the provision of "services directed towards expertise in . . . accounting . . . for financial institutions." *See United States v. Bass*, 404 U.S. 336, 340 n.6 (1971) (noting that while "commas at the end of series can avoid ambiguity," the "use of such commas is discretionary").

In total, a plain reading of the 2017-18 Policy establishes that Chubb had no duty to defend or duty to indemnify in connection with the Underlying Litigation, as the services at issue in the Underlying Litigation were not provided to a financial institution, as required for coverage. Therefore, the Court **grants** summary judgment in favor of Chubb on Count One.[4]

---

[3] As the Court holds that auditing is a covered service under the 2017-18 Policy, the Court need not address the Plaintiffs' contention that the Defendants were estopped from arguing that auditing was not a covered service. (ECF No. 154 at 10.)

[4] The Defendants represented that resolution of Count One in their favor would render their Counterclaim (ECF No. 93) moot. (*See* ECF No. 210 at 2 n.2.) Therefore, the Court dismisses the Defendants' Counterclaim as moot. The Defendants also argue that resolution of Count One in their favor would moot the remainder of the Plaintiffs' claims. (*Id.*) While the Plaintiffs do not appear to specifically address this contention, the Court will continue to address all of the Plaintiffs' claims.

### B. Count 2: Breach of Contract

Count Two states a breach of contract for Chubb's alleged failure to defend and indemnify Constantin, on the theory that the 2017-18 Policy was a renewal of the 2016-17 Policy. However, the definition of "management consulting services" was the same in the 2016-17 Policy as it was in the 2017-18 Policy. (*See* ECF No. 155 at ¶ 15; ECF No. 185 at ¶ 15.) Therefore, the Court **grants** summary judgment on Count Two in favor of Chubb for the same reasons laid out above.

### C. Count 3: Reformation of Contract

The Plaintiffs seek to reform the 2017-18 Policy, arguing that the Defendants failed to apprise Control Group of any change in terms of the renewal policy—namely, the removal of Constantin as an Insured. As the Plaintiffs move for summary judgment on this issue of whether Constantin is an Insured under the 2017-18 Policy, the Court construes the Plaintiffs' motion to seek summary judgment on Count 3.

The Defendants move for summary judgment on this claim primarily under two theories: (1) the 2017-18 Policy was not a renewal policy subject to the strict requirements for notice of changes in terms and (2) in any event, the Defendants gave adequate notice of a change in terms. (ECF No. 161 at 18–20.)

***First***, the Court holds that the 2017-18 Policy was a renewal policy. From 2011 to 2017, the Defendants sent a "notice of non-renewal" to Control Group, which gave Control Group notice that action was needed to renew its policy. (ECF No. 184 at ¶ 55; ECF No. 192 at ¶ 55.) This notice does not, as the Defendants appear to argue, definitively resolve the issue of whether the 2017-18 Policy was a renewal. Rather, after the notice was sent in September 2017, Control Group, through a third party, requested a "renewal application" from Chubb. (ECF No. 156 at ¶ 28; ECF No. 184 at ¶ 28; ECF No. 156-24.) From that point, the parties consistently referred to the Policy as a renewal. In November 2017, Chubb forwarded "the renewal app." (ECF No. 156 at ¶ 29; ECF No. 184 at ¶ 29.) In early December 2017, Control Group sent a signed "Renewal Application," which had a heading that read "Chubb Pro E&O Renewal Application." (ECF No. 196-5; ECF No. 185 at ¶ 159; ECF No. 196 at ¶ 159.) After the 2017-18 Policy was bound, the Defendant's underwriter thanked Control Group for "the renewal business." (ECF No. 185 at ¶ 161; ECF No. 196 at ¶ 161.)

To argue that the 2017-18 Policy was not a renewal, the Defendants maintain that the 2017-18 Policy was on a different form than the previous policy, and therefore it could not have been a simple renewal. (ECF No. 187

at 18.) Moreover, the Defendants explain that the term "renewal" was only used at the time of drafting in order to "accurately record progress [internally] toward underwriting goals." (*Id.*) But the Defendants do not argue that Control Group was aware of these internal underwriting goals or that Control Group was privy to the Defendants' internal understanding of the term "renewal."

The Defendants plainly referred to the 2017-18 Policy as a renewal at the time of drafting and binding. An undisclosed internal definition that departed from the common meaning of "renewal" has no bearing on whether the 2017-18 Policy was a renewal. And while the final 2017-18 Policy was on a different form than the previous policy, the parties still referred to it as a renewal. The mere presence of different terms or a different form alone does not change a renewal into something else. *See Am. Cas. Co. of Reading, Pa. v. Continisio*, 819 F. Supp. 385, 400 (D.N.J. 1993) (rejecting the proposition that a renewal policy cannot have a substantial change in terms).

**Second**, the Court holds that the Defendants did not give adequate notice of any change in the renewed Policy's definition of Insured. Under New Jersey law, "[a]bsent notification that there have been changes in the restrictions, conditions or limitations of [a renewed insurance] policy, the insured is justly entitled to assume that they remain the same." *Bauman v. Royal Indem. Co.*, 174 A.2d 585, 592 (N.J. 1961). If the insured is not "*specifically and clearly* informed of [a] change, the renewal will be ineffective." *See McClellan v. Feit*, 870 A.2d 644, 649 (N.J. App. Div. 2005) (emphasis added).

The Defendants never gave Control Group clear and specific notice of a change in the definition of Insured or of any change in what entities were provided coverage under the Policy. (ECF No. 156 at ¶¶ 37–39; ECF No. 184 at ¶¶ 36–39.) The Defendants primarily argue that adequate notice was given (1) when Mr. Murray listed some of the "enhancements" of the "new form" and (2) when the Defendants delivered the bound policy and asked Control Group to review it. (ECF No. 161 at 19.) Any suggestion that Control Group need only have read the 2017-18 Policy to learn of changes flies in the face of *Bauman*, which explicitly puts the burden on the insurer to give clear and specific notice of a change. *See Bauman*, 174 A.2d at 592. Moreover, while Mr. Murray noted some "enhancements" in the new form, he did not notify Control Group of any change in the definition of Insured or a change in the determination of what entities were covered. (ECF No. 155-42; ECF No. 185 at ¶ 85.)

As the 2017-18 Policy was a renewal and as the Defendants did not give Control Group adequate notice of a change in the definition of Insured or what

entities were covered under the Policy,[5] the Court **denies in part** the Defendants' motion for summary judgment on Count Three. As set forth above, the Court **grants in part** the Plaintiffs' motion, finding that the 2017-18 Policy should be reformed to state that Constantin is an Insured.[6] However, to the extent that the Plaintiffs argue that the Defendants had a duty to defend and indemnify Constantin under the *reformed* 2017-18 Policy, the Court holds that the Defendants had no duty here. The Court's interpretation, discussed above, of the "management consulting services" clause is the same under the reformed 2017-18 Policy, and the clause was not triggered, as Constantin did not provide covered services to a financial institution. Therefore, with respect to any duty to defend and indemnify and for Chubb to pay compensatory and consequential damages under Count 3, the Court **grants** summary judgment on Count 3 in favor of the Defendants for the same reasons laid out above.

### D. Count 4: Breach of Contract

In Count Four, the Plaintiffs allege that ERI breached the 2017-18 Policy by failing to defend and indemnify Constantin in the Underlying Litigation. As the Court holds that there was no duty to defend or indemnify in connection with the Underlying Litigation, the Court **grants** summary judgment in ERI's favor on Count Four.

---

[5] The Defendants also argue that Count Three, as well as Counts Two through Seven, cannot be sustained under the theories of *in pari delicto* and unclean hands. (ECF No. 161 at 25.) The Defendants reason that Control Group falsely represented that Constantin was its subsidiary, thereby wrongfully obtaining coverage for Constantin prior to 2017. (*Id.*) The only example that the Defendants provide of Control Group representing that Constantin was its subsidiary was that the applicant on the 2016-17 Policy was named as "[Control Group] and Subsidiaries." (*Id.*) However, it is unclear whether this statement refers to Constantin at all. And it is undisputed that Constantin was insured under the 2016-17 Policy, not because it was a subsidiary but because it was listed by endorsement. (ECF No. 156 at ¶ 27; ECF No. 184 at ¶ 27.) While the Defendants refer to this as a "subsidiary list," there is no indication in the record that the entities covered by endorsement in the 2016-17 Policy had to be Control Group's subsidiaries. Rather, the 2016-17 Policy defined Insured as "the person or entity stated in Item 1 of the Declarations," and the endorsement amended Item 1 of the Declaration to add additional Insureds. (ECF No. 155-16.) Therefore, there is no undisputed record evidence permitting the Court to conclude that Control Group wrongfully represented that Constantin was its subsidiary in order to obtain coverage for Constantin.

[6] As the Court holds that Control Group was not adequately notified of a change in terms concerning the Insureds in the 2017-18 Policy, the Court need not address the Plaintiffs' argument that the Defendants are estopped from arguing that Constantin was not an Insured. (ECF No. 186 at 20–21.) Moreover, as the Court holds that the Defendants did not satisfy the notice requirements set out in *Bauman*, the Court need not address whether the Defendants satisfied or were subject to the notice requirements set out in N.J.A.C. § 11:1-20.2.

### E. Counts 5–7

Before reaching the merits of Counts Five through Seven, the Court must determine what entity has brought these claims. Constantin previously pled these claims, although the Court later held that Constantin had no standing to do so. (ECF No. 212.) The Plaintiffs subsequently brought a motion to substitute, seeking to substitute the Plaintiffs for Constantin as to Counts Five through Seven. (ECF No. 215.) Courts will generally permit substitution under Rule 17(a)(3) where (1) there was an honest or understandable mistake in determining the proper party to bring suit and (2) the substitution "will not alter the substance of the action." *Cifuentes v. Regions Bank*, No.11-23455-CIV, 2012 WL 2339317, at *7 (S.D. Fla. June 19, 2012) (Moreno, J.) (quoting *Park B. Smith v. CHF Indus., Inc.*, 811 F. Supp. 2d 766, 773–74 (S.D.N.Y. 2011)).

Here, the decision for Constantin to bring Counts Five through Seven was an honest and understandable mistake, and substitution will not alter this case. By their own admission, the Defendants undertook months of discovery to determine who could bring these claims (ECF No. 219 at 13), and the parties resorted to motions practice to determine whether Constantin had standing to bring these claims. Moreover, the relief sought will not change the nature of the claims—only the party bringing the claims. Therefore, substitution will not alter this action or cause prejudice to the Defendants. In all, the Court **grants** the Plaintiffs' motion to substitute (ECF No. 215) and finds that (1) there was an honest and understandable mistake in determining the appropriate party to bring Counts Five through Seven, (2) the substitution will not alter the substance of this action, (3) the motion to substitute was brought in a reasonable time after the Court issued its order on the Defendants' motion to dismiss, and (4) there is no prejudice to the Defendants, as they have been aware of these claims for months and had ample opportunity to develop their legal strategy.

Nonetheless, Counts Five through Seven fail. In these Counts, the Plaintiffs allege that the Defendants made false representations concerning whether the 2017-18 Policy was a renewal. In particular, Count Five alleges fraud,[7] Count Six negligent misrepresentation, and Count Seven violation of the New Jersey Consumer Fraud Act. As the Plaintiffs explained, these theories are brought in the alternative—either the 2017-18 Policy truly is a renewal or the Defendants fraudulently misrepresented that it was a renewal. (ECF No. 154 at 6.) As the Court held that the 2017-18 Policy is a renewal and

---

[7] In Count Five, the Plaintiffs also sought punitive damages, which the Defendants argued could not be obtained. As the Court grants summary judgment and dismisses Counts Five through Seven, the Court also dismisses the Plaintiffs' request for punitive damages.

reformed it, the Court finds that Counts Five through Seven fail. Therefore, the Court will **grant** summary judgment in the Defendants' favor as to Counts Five through Seven.

### 4. Conclusion

In total, the Court **grants in part and denies in part** the Defendants' motion for summary judgment (**ECF No. 161**) and **grants in part and denies in part** the Plaintiffs' partial motion for summary judgment (**ECF No. 154**). In particular, the Court grants summary judgment in the Defendants' favor as to Counts 1, 2, 4, 5, 6, and 7. As for Count 3, the Court **grants** the Plaintiffs' motion for partial summary judgment on the issue of whether the 2017-18 Policy was a renewal and reforms the 2017-18 Policy to state that Constantin is an Insured. But the Court finds that with respect to any duty to defend and indemnify Constantin for the claims in the Underlying Lawsuit and for Chubb to pay the Plaintiffs any compensatory and consequential damages on Count 3, the Court **grants** summary judgment on those aspects of Count 3 in favor of Chubb. As the Court reformed the 2017-18 Policy and found that Constantin is an Insured, the Court **denies** the Defendants' motion to dismiss Count 1.[8] (**ECF No. 143**.) Moreover, the Court **grants** the Plaintiffs' motion to substitute (**ECF No. 215**) for the reasons set out above. Last, the Court **denies** the parties' requests for oral argument.

As set out above, all claims and counterclaims have been adjudicated. Pursuant to Fed. R. Civ. P. 58(a), judgment will be entered by a separate document. The Court directs the Clerk to **close** this case. All remaining pending motions are **denied as moot**.

**Done and ordered**, in Miami, Florida, on February 25, 2022.

_____
Robert N. Scola, Jr.
United States District Judge

---

[8] On November 15, 2021, the Court construed the Defendants' motion to dismiss Count 1 as part of the Defendants' motion for summary judgment. (ECF No. 209.)